IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TATIANA HAMAWI,<br><br>Plaintiff,<br><br>v<br><br>MASSACHUSETTS BOARD OF REGISTRATION IN MEDICINE,<br><br>Defendants. | No. 1:26-cv-14741<br><br>**COMPLAINT** |

Plaintiff, Dr. Tatiana Hamawi, ("Plaintiff" or "Dr. Hamawi"), by and through undersigned counsel, brings this Complaint against Defendants Massachusetts Board of Registration of Medicine, sued as its individual members in their official capacities, and alleges as follows:

**PARTIES**

1. Plaintiff Dr. Tatiana Hamawi is a physician licensed to practice medicine in Massachusetts since 1997.
2. Dr. Hamawi earned her undergraduate degree from the University of Massachusetts at Amherst in 1989, and her medical doctorate from the Mount Sinai School of Medicine in New York in 1994.
3. In 2002, Dr. Hamawi started and currently operates a solo practice providing primary care for infants, children and adults in a fee-for-service model.

4. Defendant Massachusetts Board of Registration in Medicine ("BORIM") is composed of up to seven Massachusetts residents appointed by the governor, and tasked with making rules and regulations concerning the practice of medicine, pursuant to Massachusetts General Laws Chapter 13, § 10.

5. Five BORIM members must be physicians licensed in Massachusetts, while two members represent the public.

6. Pursuant to Massachusetts General Laws, Chapter 112, § 5, BORIM has the authority, under Massachusetts General Laws Chapter 112, § 5, after investigation and a hearing pursuant to the Massachusetts Administrative Procedure Act, to "revoke, suspend, or cancel" a physician's license to practice in Massachusetts upon finding that the physician "practice[ed] medicine fraudulently, or beyond its authorized scope, or with gross incompetence, or with gross negligence on a particular occasion or negligence on repeated occasions."

7. Massachusetts General Laws, Chapter 30A, § 14 provides for judicial review of BORIM's decision to revoke, suspend, or cancel a physician's license to practice in Massachusetts in the state's Superior Court.

8. BORIM is sued as its individual members in their official capacities.

**JURISDICTION AND VENUE**

9. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff's claims arise under 42 U.S.C. § 1983.

10. This Court has personal jurisdiction over BORIM as a Massachusetts state agency with a principal place of business in Massachusetts, and over BORIM's individual members as Massachusetts residents.

11. Venue in the District of Massachusetts is appropriate pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts.

12. Venue in the District of Massachusetts is otherwise appropriate pursuant to 28 U.S.C. § 1391 because Defendant BORIM has a principal place of business and its individual member Defendants reside in Massachusetts.

## FACTS

13. During the COVID-19 pandemic, there were two outpatient treatments available for mild-to-moderate COVID-19: (a) intravenous infusions of monoclonal antibodies (mAb) and (b) the oral antiviral Paxlovid.

14. Throughout the COVID-19 pandemic, the supply of both therapy types was extremely constrained.

15. While mAbs were authorized for emergency use by the FDA in late 2020, they were still only available at a handful of sites in Massachusetts as late as the Omicron surge in early 2022.

16. In the Worcester area of Massachusetts, the only available site for mAbs infusions was at the Covid Treatment Center, operated by Defendant Sandeep Jubbal within the University of Massachusetts Memorial Health ("UMMH") hospital

17. Patients were forced to travel from all over the state and broader region to receive infusions at UMMH.

18. Many patients were turned away from UMMH due to the scarcity of mAbs infusions.

19. Paxlovid was authorized by the FDA for emergency use to treat high-risk patients with mild-to-moderate COVID-19 on December 22, 2021.

20. Federal allocations of Paxlovid to Massachusetts were extremely limited in early 2022.

21. Ivermectin is a drug that is approved by the Food and Drug Administration for use in humans and animals to treat various roundworm parasites.

22. Scientific study results published between the 1970 discovery of ivermectin and the COVID-19 pandemic indicated that ivermectin has a wide safety margin in humans, and can be employed safely at doses up to 10 times the highest FDA-approved does.

23. Studies also showed that ivermectin could have new applications at higher therapeutic doses in the treatment and control of several important human diseases.

24. Ivermectin was shown to inhibit viral replication in several viruses called "flaviviruses."

25. Flaviviruses are a type of virus that replicates itself using a molecule called positive-sense single-stranded RNA.

26. The virus that causes COVID-19 also replicates itself using positive-sense single-stranded RNA.

27. Hydroxychloroquine is a drug that is approved by the FDA for use in humans to treat malaria.

28. The infectious agent that causes malaria enters and replicates inside human cells.

29. Hydroxychloroquine prevents the infectious agent that causes malaria from entering human cells.

30. Like the infectious agent that causes malaria, the virus that causes COVID-19 also enters and replicates inside human cells.

31. Hydroxychloroquine is also approved to treat the autoimmune diseases rheumatoid arthritis and lupus erythematosus in adult humans.

32. Early in 2020, researchers and clinicians treating COVID-19 patients in various countries and regions of the world began to report in medical academic literature that ivermectin and hydroxychloroquine may be safe and effective treatments and/or prophylactics for COVID-19.

33. Hydroxychloroquine was briefly authorized on an emergency basis by the FDA in 2020 for use as a treatment for severe cases of COVID-19.

34. Early during the COVID-19 pandemic, the debate over what constituted effective COVID-19 treatments deserted the tether of science and curved political.

35. Indeed, the general politicization of medicine preceded the COVID-19 pandemic.

36. A 2016 Yale University study published in the Proceedings of the National Academies of Sciences suggested "that Republican and Democratic physicians differently assess the seriousness of patient health issues that are politically salient. Republican physicians also differ from Democratic physicians in the treatments offered to patients who present with those health issues."[1]

37. The Republican Party and the Donald Trump administrations embraced ivermectin and hydroxychloroquine stances.

38. The Democrat Party and the Joseph Biden administration rejected ivermectin and hydroxychloroquine for the treatment of COVID-19, preferring mAb and Paxlovid instead.

39. On September 21, 2021, the Food and Drug Administration released an informal "Consumer Update" titled "Why You Should Not Use Ivermectin to Treat or Prevent COVID-19" ("Update").

[1] https://www.pnas.org/doi/10.1073/pnas.1606609113

40. On October 6, 2021, U.S. Senators Ben Ray Luján (D-N.M.), Amy Klobuchar (D-Minn.), and Martin Heinrich (D-N.M.) called on the online platform Reddit to remove information "specific to the unproven and dangerous use of ivermectin to treat Coronavirus-19 (COVID-19)."

41. In 2023, Robert F. Kennedy, Jr., who became the second Trump Administration's Secretary of the U.S. Department of Health and Human Services, claimed that pharmaceutical companies and mainstream media "had to destroy ivermectin and hydroxychloroquine and discredit it, and they had to tell everybody it's not effective [for COVID-19] because if they had acknowledged that it's effective … the whole $200 billion [COVID-19] vaccine enterprise would have collapsed."

42. The early partisan divide over COVID-19 treatments extended not only to lay politicians, but also to licensed physicians.

43. A 2022 Harvard University study published in the Journal of the American Medical Association found that hydroxychloroquine and ivermectin prescribing volumes in 2020 were "significantly higher in the highest vs lowest Republican vote share counties" in the 2020 U.S. presidential elections.[2]

44. A 2023 University of Pittsburgh and Harvard University study published in the Proceedings of the National Academies of Sciences found "strong evidence of belief polarization about COVID-19 treatments even among highly trained professionals making informed judgments within their area of expertise."[3]

---

[2] https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2789363
[3] https://www.pnas.org/doi/10.1073/pnas.2216179120

45. The results of our experiment reveal that political ideology colors the evaluation of scientific evidence to a greater degree when it pertains to a politicized treatment. After reading otherwise identical results, partisans' responses were more polarized when the drug was identified as ivermectin relative to when it was anonymized

46. By late 2020, Dr. Tatiana Hamawi believed that there was sufficient evidence in medical academic literature that ivermectin and hydroxychloroquine were safe and potentially effective in treating and preventing COVID-19.

47. Dr. Hamawi began to prescribe ivermectin as a treatment or prophylactic for COVID-19 in late December 2020.

48. Dr. Hamawi began to prescribe hydroxychloroquine as a treatment or prophylactic for COVID-19 in early 2022 during the surge in COVID-19 cases due to the emergence of the highly transmissible Omicron strain of the virus that causes COVID-19.

49. Between 2020 and 2024, Dr. Hamawi prescribed ivermectin and/or hydroxychloroquine for COVID-19 treatment or prophylaxis 172 times.

50. Additionally, Dr. Hamawi prescribed ivermectin seven (7) times for scabies in 2020.

51. Most of the patients who were prescribed ivermectin and/or hydroxychloroquine for COVID-19 treatment or prophylaxis by Dr. Hamawi had various comorbidities, including obesity, immunosuppression, and advanced age.

52. None of Dr. Hamawi's patients who were prescribed ivermectin and/or hydroxychloroquine for COVID-19 treatment or prophylaxis died from COVID-19.

53. Only one of Dr. Hamawi's patients who was prescribed ivermectin for COVID-19 treatment was hospitalized.

54. The hospitalized patient had Type 1 diabetes and obesity as comorbidities, and had been hospitalized due to diabetes complications.

55. On January 5, 2023, Maura Healey was sworn in as the Governor of Massachusetts.

56. Maura Healey is a Democrat, and she replaced the Republican Governor Charlie Baker.

57. On August 24, 2023, Dr. Hamawi prescribed ivermectin and hydroxychloroquine to one of her primary care patients, Jane Doe, who had a fever and tested positive for the virus that causes COVID-19.

58. Doe's fever from COVID-19 resolved within twenty-four (24) hours of first dosing with ivermectin and hydroxychloroquine.

59. Doe's comorbidities include asthma and eosinophilic granulomatosis with polyangiitis ("EGPA"), a rare autoimmune condition.

60. Doe receives a biologic injection treatment called Nucala (generic name mepolizumab) for her asthma and EGPA, which is prescribed by her pulmonologist, Kevin Martin of the Reliant Medical Group.

61. About twelve to twenty-four (12-24) hours after first dosing with ivermectin and hydroxychloroquine, Doe noticed a mild redness followed by an itchy rash; and Dr. Hamawi prescribed a steroid for the redness.

62. After the rash continued to spread over the following day, Dr. Hamawi instructed Doe to stop taking ivermectin and hydroxychloroquine, prescribing a steroid to address the rash.

63. Doe's rash continued to spread over the following several days, even though Doe stopped taking ivermectin and hydroxychloroquine, and began taking steroids.

64. On August 29, 2026, Dr. Hamawi examined Doe and recommended that Doe go to the hospital at University of Massachusetts Memorial Health, where she can get supportive care and a multidisciplinary team.

65. At the hospital, despite additional treatment, Doe's rash continued to extend, reaching around 90% of body surface area, and requiring intensive care, although Doe soon began to feel better.

66. The initial emergency and internal medicine physicians who examined Doe on admission to UMMH believed the rash to be drug-induced by ivermectin and hydroxychloroquine.

67. However, the dermatology specialists who examined Doe inpatient and during a later outpatient visit ultimately diagnosed Doe with pustular psoriasis "[t]hought to be due to patient's Nucala which she takes for EGPA."

68. According to the dermatologists' treatment plan for Doe:

> Patient with inpatient admission due to significant drug reaction. Suspected pustular psoriasis due to Nucala therapy which has since been stopped. Patient's rash has improved and is resolving, but we discussed that she had a significant drug reaction and it will take several months for strength to return and fatigue to resolve. We discussed that we have read case reports of palmoplantar psoriasis after Nucala therapy. Another case report discusses a patient with eosinophilic granulomatosis with polyangiitis, who was well-controlled on Nucala, developed a psoriasis-like rash due to a local infection.

69. The dermatologists recommended that the "patient continue to hold off on Nucala" until her psoriasis could be adequately controlled with another biologic called Skyrizi (generic risankizumab).

70. On September 18, 2023, Jane Doe called her pulmonologist, Kevin Martin, at Reliant Medical Group to discuss the dermatologists' recommendation to hold off on Nucala.

71. On the same date, Kevin Martin filed a physician complaint against Dr. Hamawi with the Massachusetts Board of Registration in Medicine ("BORIM"), stating:

> Patient called Reliant Medical Group regarding her care on 09/18/2023. Patient stated she was diagnosed with COVID and prescribed Hydroxychloroquine and lvermectin by her primary care on 08/24/2023. . . . Patient developed severe burning rash all over body, with palms of hands and bottom of feet peeling. Patient ended up in UMass University Campus ICU for burn treatment. Patient was prescribed two medications outside of FDA approval for COVID treatment that resulted in severe, adverse effect that caused life-threatening response to patient's health.

72. Kevin Martin is a critic of Republican President Donald Trump.

73. On September 21, 2023, BORIM's chairman informed Dr. Hamawi of the complaint against her and subpoenaed Dr. Hamawi for all of Jane Doe's medical records.

74. After Dr. Hamawi learned of the complaint against her, she was afraid to recommend ivermectin and hydroxychloroquine to her patients to treat COVID-19 due to the threat of discipline therefor.

75. If not for the threat of discipline for recommending ivermectin and hydroxychloroquine to her patients to treat COVID-19, Dr. Hamawi would have continued to recommend both drugs to her patients for this purpose.

76. On September 24, 2023, Dr. Hamawi produced Jane Doe's medical records to BORIM's chairman.

77. On May 14, 2024, BORIM docketed the complaint against Dr. Hamawi for investigation as BORIM Dkt. No. 23-570.

78. On December 13, 2024, BORIM's complaint investigator requested that Dr. Hamawi provide the following information for "each patient" to whom she prescribed ivermectin and hydroxychloroquine:

   1. The patient's initials and date of birth;
   2. The date(s) of the diagnosis of COVID-19;
   3. When you prescribed hydroxychloroquine and ivermectin;

4. How many days did you prescribe hydroxychloroquine and ivermectin;
5. Each patient's comorbidities;
6. Whether or not the patient was hospitalized due to COVID-19 or related symptoms;
7. Whether the patient died as a result of COVID-19 or related symptoms; and
8. The date that the patient was no longer infected with COVID-19.

79. On June 10, 2025, Dr. Hamawi produced a spreadsheet containing the requested information to BORIM's complaint investigator.

80. On September 16, 2025, BORIM's chairman subpoenaed Dr. Hamawi for all medical records of seven (7) additional patients to whom Dr. Hamawi prescribed ivermectin and/or hydroxychloroquine to treat COVID-19.

81. The subpoena for one (1) of the seven (7) patients later was retracted.

82. Dr. Hamawi provided all medical records of the six (6) remaining subpoenaed patients.

83. BORIM's chairman did not subpoena Dr. Hamawi for the medical records of any patients to whom Dr. Hamawi prescribed ivermectin to treat scabies.

84. On January 30, 2026, BORIM's investigator requested answers to interrogatories concerning three (3) of the six (6) remaining subpoenaed patients, generally requesting that Dr. Hamawi explain her rationale for prescribing ivermectin to these patients.

85. BORIM's investigator did not ask that Dr. Hamawi explain her rationale for prescribing hydroxychloroquine to any patients.

86. On June 18, 2026, BORIM's complaint counsel notified Dr. Hamawi that BORIM's Complaint Committee will be meeting on October 8, 2026 to discuss the complaint against her.

87. On October 8, 2026, Dr. Hamawi, by counsel, informed BORIM's Complaint Committee and complaint counsel that BORIM is precluded by the speech protections of the First Amendment from proceeding with the complaint against Dr. Hamawi based on the information obtained during BORIM's investigation.

88. A BORIM member indicated during the BORIM Complaint Committee meeting that BORIM nevertheless intends to adjudicate the complaint against Dr. Hamawi for using ivermectin and/or hydroxychloroquine to treat COVID-19, and refused to disclaim discipline based on Dr. Hamawi's use of ivermectin and/or hydroxychloroquine to treat COVID-19.

## COUNT I
## (Viewpoint Discrimination under the First and Fourteenth Amendments in Violation of 42 U.S.C. § 1983)

89. BORIM is a state actor.

90. In threatening Dr. Hamawi with discipline for her use of ivermectin and/or hydroxychloroquine to treat COVID-19, BORIM acted intentionally on a preference for the Democrat Massachusetts governor and Democrat physicians' viewpoint rejecting ivermectin and hydroxychloroquine for the treatment of COVID-19.

91. BORIM did not discipline or threaten to discipline BORIM member Sandeep Jubbal for providing COVID-19 treatments preferred by Democrat physicians.

92. On information and belief, BORIM did not discipline or threaten to discipline any physicians for providing COVID-19 treatments preferred by Democrat physicians.

93. BORIM did not threaten to discipline Dr. Hamawi for using ivermectin to treat scabies.

94. Therefore, the BORIM Defendants, sued as its individual members in their official capacity, are engaging in an ongoing deprivation of Dr. Hamawi's First and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983, causing her injury.

## RELIEF REQUESTED

WHEREFORE, Plaintiff request that this Court:

a) Declare that Defendant BORIM members, in their official capacities, have violated Plaintiff's rights under the First and Fourteenth Amendment by discriminating in its physician licensing and discipline decisions against Plaintiff's viewpoint in favor of using of ivermectin and/or hydroxychloroquine to treat COVID-19.

b) enter judgment in Plaintiff's favor and against the individual Defendant BORIM members in their official capacities pursuant to 42 U.S.C. § 1983;

c) enjoin the individual Defendant BORIM members, in their official capacities, from continuing to investigate or adjudicate BORIM Dkt. No. 23-570—or any other matter based on Plaintiff's use of ivermectin and/or hydroxychloroquine to treat COVID-19;

d) award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

e) grant any other relief that the Court deems proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,
Plaintiff, Tatiana Hamawi,
By her attorney,

____________________________
Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
LAW OFFICE OF ILYA FEOKTISTOV
60 Burnham Drive
Falmouth, MA 02540
(617) 462-7938
if@ilyafeoktistov.com

DATED: October 19, 2026.