IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

TATIANA HAMAWI,

Plaintiff,

v

MASSACHUSETTS BOARD OF REGISTRATION IN MEDICINE, sued as its individual members in their official capacities,

Defendants.

No. 4:26-cv-14741-DHH

**VERIFIED FIRST AMENDED COMPLAINT**

Plaintiff, Dr. Tatiana Hamawi, ("Plaintiff" or "Dr. Hamawi"), by and through undersigned counsel, brings this First Amended Complaint against Defendant Massachusetts Board of Registration of Medicine, sued as its individual members in their official capacities, and alleges as follows:

## PARTIES

1. Dr. Hamawi is a physician licensed to practice medicine in Massachusetts since 1997.
2. Dr. Hamawi earned her undergraduate degree from the University of Massachusetts at Amherst in 1989, and her medical doctorate from the Mount Sinai School of Medicine in New York in 1994.
3. In 2002, Dr. Hamawi started and currently operates a solo practice providing primary care for infants, children and adults in a subscription-based and fee-for-service model.
4. Defendant Massachusetts Board of Registration in Medicine ("BORIM") is composed of up to seven Massachusetts residents appointed by the governor, and tasked with making

rules and regulations concerning the practice of medicine, pursuant to Massachusetts General Laws Chapter 13, § 10.

5. Five BORIM members must be physicians licensed in Massachusetts, while two members represent the public.

6. Pursuant to Massachusetts General Laws, Chapter 112, § 5, BORIM has the authority, under Massachusetts General Laws Chapter 112, § 5, after investigation and a hearing pursuant to the Massachusetts Administrative Procedure Act, to "revoke, suspend, or cancel" a physician's license to practice in Massachusetts upon finding that the physician "practice[ed] medicine fraudulently, or beyond its authorized scope, or with gross incompetence, or with gross negligence on a particular occasion or negligence on repeated occasions."

7. Massachusetts General Laws, Chapter 30A, § 14 provides for judicial review of BORIM's decision to revoke, suspend, or cancel a physician's license to practice in Massachusetts in the state's Superior Court.

8. BORIM is sued as its individual members in their official capacities.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff's claims arise under 42 U.S.C. § 1983.

10. This Court has personal jurisdiction over BORIM as a Massachusetts state agency with a principal place of business in Massachusetts, and over BORIM's individual members as Massachusetts residents.

11. Venue in the District of Massachusetts is appropriate pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts.

12. Venue in the District of Massachusetts is otherwise appropriate pursuant to 28 U.S.C. § 1391 because Defendant BORIM has a principal place of business and its individual member Defendants reside in Massachusetts.

## FACTS

### The Controversy Over Using Ivermectin and Hydroxychloroquine for COVID-19

13. During the COVID-19 pandemic, the majority opinion within the medical community in Massachusetts and nationally was that mild-to-moderate COVID-19 should be treated with intravenous infusions of monoclonal antibodies (mAb) and/or the oral antiviral Paxlovid.

14. Throughout the main surges of the COVID-19 pandemic, the supply of both therapy types was extremely constrained.

15. While mAbs were authorized for emergency use by the FDA in late 2020, they were still only available at a handful of sites in Massachusetts as late as the Omicron surge in early 2022.

16. In the Worcester area of Massachusetts, the only available site for mAbs infusions was at the Covid Treatment Center, operated by BORIM member Sandeep Jubbal within the University of Massachusetts Memorial Health ("UMMH") hospital.

17. Patients were forced to travel from all over the state and broader region to receive infusions at UMMH.

18. Many patients were turned away from UMMH due to the scarcity of mAbs infusions.

19. Paxlovid was authorized by the U.S. Food and Drug Administration ("FDA") for emergency use to treat high-risk patients with mild-to-moderate COVID-19 on December 22, 2021.

20. Federal allocations of Paxlovid to Massachusetts were extremely limited in early 2022.

21. At the beginning of the pandemic, a minority of frontline physicians, such as Dr. Hamawi, had used their objective professional judgment to identify widely-available drugs that were safe and possibly effective to treat or prevent COVID-19.

22. Early in 2020, a minority of researchers and clinicians treating COVID-19 patients in various countries and regions of the world began to report in medical academic literature that ivermectin and hydroxychloroquine are safe and may be effective in treating or preventing COVID-19.

23. Ivermectin is a drug that is approved by the Food and Drug Administration for use in humans and animals to treat various roundworm parasites.

24. Scientific study results published between the 1970 discovery of ivermectin and the COVID-19 pandemic indicated that ivermectin has a wide safety margin in humans, and can be employed safely at doses up to 10 times the highest FDA-approved dose.

25. Studies also showed that ivermectin could have new applications at higher therapeutic doses in the treatment and control of several important human diseases.

26. Ivermectin was shown to inhibit viral replication in several viruses called "flaviviruses."

27. Flaviviruses are a type of virus that replicates itself using a molecule called positive-sense single-stranded RNA.

28. The virus that causes COVID-19 also replicates itself using positive-sense single-stranded RNA.

29. Hydroxychloroquine was briefly authorized on an emergency basis by the FDA in 2020 for use as a treatment for severe cases of COVID-19.

30. Hydroxychloroquine is a drug that is approved by the FDA for use in humans to treat malaria.

31. Hydroxychloroquine is also approved to treat the autoimmune diseases rheumatoid arthritis and lupus erythematosus in adult humans.

32. Hydroxychloroquine is thought to work by inhibiting the virus that causes COVID-19 from entering and replicating inside human cells, as well as by limiting the inflammatory response caused by the disease.

33. During the COVID-19 pandemic, the scientific debate over what constituted effective COVID-19 treatments turned political.

34. In December 2020, critical care physician Dr. Pierre Kory, former Chief of the Critical Care Service and Medical Director of the Trauma and Life Support Center at the University of Wisconsin, testified before the Senate Homeland Security and Government Affairs Committee in support of the minority opinion that ivermectin is safe and effective for the treatment and prevention of COVID-19.

35. Many lawmakers, as well as then-President Trump, endorsed Dr. Kory's testimony and promoted ivermectin, as well as hydroxychloroquine, as COVID-19 drugs.

36. Many other lawmakers disagreed and disfavored the minority opinion, with the efficacy of ivermectin or hydroxychloroquine for human use to treat COVID-19 becoming a highly controversial and politicized question.

37. As a consequence, in regulating the practice of medicine within their jurisdictions, different state governments have afforded a special favored or disfavored status to ivermectin and/or hydroxychloroquine for the treatment or prevention of COVID-19.

38. Some states, like Missouri, whose government favored the minority view concerning the safety and potential effectiveness of ivermectin and/or hydroxychloroquine for COVID-19, codified statutory protections for these drugs' use in this manner.

39. In 2022, Missouri enacted a statute prohibiting its board of pharmacists from taking any disciplinary action against pharmacists for "the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions." *See* Mo. Rev. Stat. § 338.055(7).

40. Other states, such as Nebraska, extended executive branch protections to prescribing the drugs, with the Nebraska Office of the Attorney General Office issuing a 48-page opinion in 2021 at the request of the Executive Director of the Nebraska Department of Health and Human Services, stating that the state will not discipline physicians for prescribing ivermectin or hydroxychloroquine off-label for treatment of COVID-19. [1]

41. Other states—Arkansas, Idaho, Iowa, Louisiana, Missouri (in 2026), Tennessee, and Texas so far—simply enacted statutes making ivermectin an over-the-counter drug or allowing it to be dispensed without a prescription.#*See* Ark. Code § 20-7-147; Idaho Code § 37-135; Iowa Code § 126.24; La. Rev. Stat. § 37:1218.3; Mo. Rev. Stat. § 338.208; Tenn. Code § 63-10-224; Tex. Health & Safety Code § 445.001.

---

[1] *See* Office of the Attorney General of Nebraska, *Memorandum Concerning Prescription of Ivermectin or Hydroxychloroquine as Off-Label Medicines fore the Prevention or Treatment of COVID-19* (Oct. 14, 2021), https://ago.nebraska.gov/sites/default/files/docs/opinions/21-017_0.pdf.

42. The governments of yet other states, such as Ohio, codified their disfavor of the minority view concerning the safety and potential effectiveness of ivermectin and/or hydroxychloroquine for COVID-19 into statutory law.

43. In 2020, Ohio "strictly prohibited . . . prescriptions issued for chloroquine or hydroxychloroquine for prophylactic use related to COVID-19 or for the treatment of COVID-19 . . . unless [used in an approved clinical trial or] otherwise approved by the [Ohio pharmacy board's] executive director in consultation with the board president, at which time a resolution shall issue." *See* Ohio Admin. Code § 4729:5-5-21.

44. Yet other states—California, Maine, Massachusetts, and Washington among them—applied their existing medical practice laws to investigate and initiate disciplinary proceedings against physicians for prescribing ivermectin and/or hydroxychloroquine to treat or prevent COVID-19 within their territories.

45. Plaintiff incorporates by reference the facts stated in *Pierre Kory v. Bonta*, No. 2:24-cv-1 WBS AC, 2026 U.S. Dist. LEXIS 174676 (E.D. Cal. Aug. 5, 2026); *Nass v. Maine Bd. of Licensure in Med.*, No. 1:23-cv-00321-LEW, 2026 U.S. Dist. LEXIS 214234 (D. Me. Aug. 20, 2026); *Wilkinson v. Washington Med. Comm'n'n*, 35 Wash. App. 2d 350, 356 (2025).

46. Like California, Maine, and Washington, the Commonwealth of Massachusetts has no statutory prohibition on prescribing ivermectin and/or hydroxychloroquine off-label for the treatment or prevention of COVID-19.

**BORIM'S Recent Discipline of Dr. John R. Diggs for Using Ivermectin Off-Label for COVID-19**

47. On August 4, 2022, Defendant Massachusetts Board of Registration in Medicine ("BORIM") issued a Statement of Allegations against John R. Diggs, M.D. ("Dr. Diggs"),

a physician licensed to practice medicine in Massachusetts ("Diggs SOA").The Diggs SOA alleged that Dr. Diggs had violated Massachusetts medical practice laws by disseminating misinformation concerning the safety and effectiveness of ivermectin for treating COVID-19.

48. The Diggs SOA further alleged that Dr. Digs had provided treatment falling below the accepted standard of care by using ivermectin to treat two patients for COVID-19.

49. Dr. Diggs filed an answer to the Diggs SOA on September 6, 2022.

50. On June 13, 2024, BORIM issued an Amended Diggs SOA, removing allegations relating to dissemination of misinformation and adding allegations concerning the use of ivermectin to treat COVID-19 in two additional patients.

51. BORIM Member Sandeep Jubbal seconded and voted for the motion to issue the Amended Diggs SOA.

52. On August 7, 2024, Dr. Diggs responded to the Amended Diggs SOA.

53. In August 2024, after hearings before an administrative magistrate at the Massachusetts Division of Administrative Law Appeals (DALA), the administrative magistrate recommended the dismissal of the Diggs matter.

54. On October 24, 2024, BORIM rejected the administrative magistrate's recommended dismissal of the Diggs matter, and remanded the matter to DALA.

55. On January 24, 2025, a DALA administrative magistrate issued an order for default and recommended that BORIM find "(1) the Respondent has failed to defend/prosecute his defense of the Amended SOA; (2) the allegations in the Amended SOA be deemed admitted; (3) the Respondent violated the laws set forth in the Legal Basis for Proposed Relief; and [(4)] that the Board discipline the Respondent as it finds appropriate.

56. BORIM then imposed discipline on Dr. Diggs under several generic Massachusetts standard-of-care statutes and precedents:

a. G.L. c. 112, § 5, ¶ 9(c) and 243 Code Mass. Regs. 1.05(a)(3);

b. 243 Code Mass. Regs. 1.05(a)(18);

c. G.L. c. 112, § 5, ¶ 8(h) and 243 Code Mass. Regs. 1.03(5)(a)(11) for violation of 243 Code Mass. Regs. 2.07(13)(a);

d. *Levy v. BORIM*, 378 Mass. 519 (1979); *Raymond v. BORIM*, 387 Mass. 708 (1982) and *Sugarman v. BORIM*, 422 Mass. 338 (1996);

e. 243 Code Mass. Regs. 1.05(a)(10); and

f. 243 Code Mass. Regs. 1.05(a)(16).

**Physicians' Ethical Duties**

57. The American Medical Association's Code of Medical Ethics provides that, "[e]xcept in emergency situations in which a patient is incapable of making an informed decision, withholding information without the patient's knowledge or consent is ethically unacceptable," because "[t]ruthful and open communication between physician and patient is essential for trust in the relationship and for respect for autonomy."

58. The Code of Medical Ethics further provides that "[t]ransparency with patients regarding all medically appropriate options of treatment is critical to fostering trust."

59. To that end, under the Code of Medical Ethics, patients have the right to "[t]o receive information from their physicians and to have opportunity to discuss the benefits, risks, and costs of appropriate treatment alternatives, including the risks, benefits and costs of forgoing treatment."

60. Patients further have the rights "[t]o obtain a second opinion," and to receive a physician's "guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment."

**Dr. Hamawi's Off-Label Use of Ivermectin and/or Hydroxychloroquine for COVID-19**

61. By late 2020, Dr. Tatiana Hamawi came to understand, based on her own objective professional judgment, that there was sufficient evidence in medical academic literature for the safety and potential effectiveness of ivermectin and hydroxychloroquine for the treatment or prevention of COVID-19.

62. Dr. Hamawi understood that her use of ivermectin and hydroxychloroquine in the treatment of COVID-19 aligned with a minority opinion of physicians in this country and around the world who found it effective.

63. Nevertheless, Dr. Hamawi believes that truthfully and honestly counseling her patients to the best of her objective professional judgment is required as a matter of professional ethics, even when her judgment conflicts with the majority opinion.

64. Dr. Hamawi further believes that it is ethically unacceptable to withhold from her patients her objective professional opinion concerning the safety and potential effectiveness of ivermectin and hydroxychloroquine for the treatment or prevention of COVID-19, even if it is a minority opinion.

65. Dr. Hamawi was aware that Dr. Diggs, Dr. Kory, and other physicians in other states were facing professional consequences for publicly advocating that ivermectin and/or hydroxychloroquine were safe and potentially effective for the treatment or prevention of COVID-19. Consequently, she never engaged in social media, public speaking, or other forms of advocacy regarding this subject.

66. Nevertheless, Dr. Hamawi began to recommend and prescribe ivermectin to her patients as a treatment or prophylactic for COVID-19 in late December 2020.

67. Dr. Hamawi also began to recommend and prescribe hydroxychloroquine to her patients as a treatment or prophylactic for COVID-19 in early 2022 during the surge in new COVID-19 cases due to the emergence of the highly transmissible Omicron strain of the virus that causes COVID-19.

68. Between 2020 and 2024, Dr. Hamawi recommended and prescribed ivermectin and/or hydroxychloroquine to her patients for COVID-19-related treatment or prevention 165 times.

69. Additionally, Dr. Hamawi recommended and prescribed ivermectin seven (7) times for the treatment of scabies in 2020.

70. Ivermectin is not approved by the FDA for the treatment of scabies.

71. After Paxlovid became broadly available in Massachusetts, Dr. Hamawi also began use Paxlovid for the treatment or prevention of COVID-19 to some patients.

72. After Paxlovid became broadly available in Massachusetts, Dr. Hamawi continued to recommend and prescribe ivermectin and hydroxychloroquine to some other patients, such as those whose existing prescription drug regimens were known to interact with Paxlovid, or those in whom Paxlovid could cause liver and renal issues.

73. Most of the patients who were recommended and prescribed ivermectin and/or hydroxychloroquine for COVID-19 treatment or prophylaxis by Dr. Hamawi had various comorbidities, including obesity, immunosuppression, and advanced age.

74. None of Dr. Hamawi’s patients who were recommended and prescribed ivermectin and/or hydroxychloroquine for COVID-19 treatment or prophylaxis died from COVID-19.

75. Only two of Dr. Hamawi's patients who were recommended prescribed ivermectin for COVID-19 treatment were hospitalized, both for reasons unrelated to COVID-19 or the treatment.

76. The first hospitalized patient, who had Type 1 diabetes and obesity as comorbidities, had been hospitalized due to diabetes complications, and not due to COVID-19.

77. The second hospitalized patient was Jane Doe.

**The Non-Patient Complaint Against Dr. Hamawi for Off-Label Ivermectin and Hydroxychloroquine Use to Treat COVID-19**

78. On August 24, 2023, Dr. Hamawi prescribed ivermectin and hydroxychloroquine to Doe, who had a fever and tested positive for the virus that causes COVID-19.

79. Jane Doe has been Dr. Hamawi's patient for over twenty (20) years, and continues to be Dr. Hamawi's patient as of the date of this Verified Amended Complaint.

80. Doe's fever from COVID-19 resolved within twenty-four (24) hours of first dosing with ivermectin and hydroxychloroquine.

81. Doe's comorbidities include asthma and eosinophilic granulomatosis with polyangiitis ("EGPA"), a rare autoimmune condition.

82. Doe receives a biologic injection treatment called Nucala (generic name mepolizumab) for her asthma and EGPA, which is prescribed by her pulmonologist, Kevin Martin of the Reliant Medical Group.

83. About twelve to twenty-four (12-24) hours after first dosing with ivermectin and hydroxychloroquine, Doe noticed a mild redness followed by an itchy rash; and Dr. Hamawi prescribed a steroid for the redness.

84. After the rash continued to spread over the following day, Dr. Hamawi instructed Doe to stop taking ivermectin and hydroxychloroquine, and to increase her steroid dose to address the rash.

85. Doe's rash continued to spread over the following several days, even though Doe stopped taking ivermectin and hydroxychloroquine, and began taking steroids.

86. On August 29, 2026, Dr. Hamawi examined Doe and recommended that Doe go to the hospital at University of Massachusetts Memorial Health, where she can get supportive care and a multidisciplinary team.

87. At the hospital, despite additional treatment, Doe's rash continued to extend, reaching around 90% of body surface area, and was admitted to intensive care for increasing monitoring needs, but on arrival to the unit was stable and already starting to feel better.

88. The initial emergency and internal medicine physicians who examined Doe on admission to UMMH believed the rash to be drug-induced by ivermectin and hydroxychloroquine.

89. However, the dermatology specialists who examined Doe inpatient and during a later outpatient visit ultimately diagnosed Doe with pustular psoriasis "[t]hought to be due to patient's Nucala which she takes for EGPA."

90. According to the dermatologists' treatment plan for Doe:

> Patient with inpatient admission due to significant drug reaction. Suspected pustular psoriasis due to Nucala therapy which has since been stopped. Patient's rash has improved and is resolving, but we discussed that she had a significant drug reaction and it will take several months for strength to return and fatigue to resolve. We discussed that we have read case reports of palmoplantar psoriasis after Nucala therapy. Another case report discusses a patient with eosinophilic granulomatosis with polyangiitis, who was well-controlled on Nucala, developed a psoriasis-like rash due to a local infection.

91. The dermatologists recommended that the "patient continue to hold off on Nucala" until her psoriasis could be adequately controlled with another biologic called Skyrizi (generic risankizumab).

92. On September 18, 2023, Jane Doe called her pulmonologist, Kevin Martin, at Reliant Medical Group to discuss the dermatologists' recommendation to hold off on Nucala until her psoriasis is controlled.

93. On the same date, Kevin Martin filed a physician complaint against Dr. Hamawi with the Massachusetts Board of Registration in Medicine ("BORIM"), stating:

> Patient called Reliant Medical Group regarding her care on 09/18/2023. Patient stated she was diagnosed with COVID and prescribed Hydroxychloroquine and lvermectin by her primary care on 08/24/2023. . . . Patient developed severe burning rash all over body, with palms of hands and bottom of feet peeling. Patient ended up in UMass University Campus ICU for burn treatment. Patient was prescribed two medications outside of FDA approval for COVID treatment that resulted in severe, adverse effect that caused life-threatening response to patient's health.

**BORIM's Investigation and Threatened Discipline of Dr. Hamawi for Using Ivermectin Off-Label to Treat COVID-19**

94. On September 21, 2023, BORIM's chairman informed Dr. Hamawi of the complaint against her and subpoenaed Dr. Hamawi for all of Jane Doe's medical records.

95. On September 24, 2023, Dr. Hamawi produced Jane Doe's medical records to BORIM's chairman.

96. On May 14, 2024, BORIM docketed the complaint against Dr. Hamawi for investigation as BORIM Dkt. No. 23-570.

97. After Dr. Hamawi received notice that the complaint against her had been docketed, she began to fear that she would be disciplined for recommending ivermectin and hydroxychloroquine to her patients to treat COVID-19. Therefore, she stopped doing so.

98. If not for the threat of discipline for recommending ivermectin and hydroxychloroquine to her patients to treat COVID-19, Dr. Hamawi would have continued to recommend both drugs to her patients for this purpose.

99. None of Dr. Hamawi's patients themselves ever complained or participated in BORIM's investigation of Complaint No. 23-570 against Dr. Hamawi.

100. On December 13, 2024, BORIM's complaint investigator requested that Dr. Hamawi provide the following information for "each patient" to whom she prescribed ivermectin and hydroxychloroquine:

a. The patient's initials and date of birth;

b. The date(s) of the diagnosis of COVID-19;

c. When you prescribed hydroxychloroquine and ivermectin;

d. How many days did you prescribe hydroxychloroquine and ivermectin;

e. Each patient's comorbidities;

f. Whether or not the patient was hospitalized due to COVID-19 or related symptoms;

g. Whether the patient died as a result of COVID-19 or related symptoms; and

h. The date that the patient was no longer infected with COVID-19.

101. On June 10, 2025, Dr. Hamawi produced a spreadsheet containing the requested information to BORIM's complaint investigator.

102. On September 16, 2025, BORIM's chairman subpoenaed Dr. Hamawi for all medical records of seven (7) additional patients to whom Dr. Hamawi prescribed ivermectin and/or hydroxychloroquine to treat COVID-19.

103. The subpoena for one (1) of the seven (7) patients later was retracted.

104. Dr. Hamawi provided all medical records of the six (6) remaining subpoenaed patients.

105. BORIM's chairman did not subpoena Dr. Hamawi for the medical records of any patients to whom Dr. Hamawi prescribed ivermectin for the treatment of scabies.

106. On January 30, 2026, BORIM's investigator requested answers to interrogatories concerning three (3) of the six (6) remaining subpoenaed patients, generally requesting that Dr. Hamawi explain her rationale for prescribing ivermectin to these patients.

107. BORIM's investigator did not ask that Dr. Hamawi explain her rationale for prescribing hydroxychloroquine to any patients.

108. On June 18, 2026, BORIM's complaint counsel notified Dr. Hamawi that BORIM's Complaint Committee will be meeting on October 8, 2026 to discuss the complaint against her.

109. Over the summer of 2026, BORIM's complaint counsel notified Dr. Hamawi by video conference that he intends to seek the suspension of her license.

110. On October 6, 2026, Dr. Hamawi retained undersigned counsel.

111. On October 8, 2026, Dr. Hamawi, by counsel, informed BORIM's Complaint Committee and complaint counsel that, subsequent to the U.S. Supreme Court's decision in *Chiles v. Salazar*, 607 U.S. 627 (2026), BORIM is precluded by the speech protections of the First Amendment from proceeding with the complaint against Dr. Hamawi based on the information obtained during BORIM's investigation.

112. A BORIM member indicated during the BORIM Complaint Committee meeting that BORIM nevertheless intends to adjudicate the complaint against Dr. Hamawi for using ivermectin and/or hydroxychloroquine to treat COVID-19, and refused to disclaim

discipline based on Dr. Hamawi's use of ivermectin and/or hydroxychloroquine to treat or prevent COVID-19.

**Dr. Hamawi's Plans**

113. Dr. Hamawi had intended to practice medicine for another 11 years before retirement.

114. After the BORIM Complaint Committee meeting, however, Dr. Hamawi began to inform patients that she is retiring because "[s]ome unfortunate events have changed the landscape and made it clear to [her] that [her] path forward is now different."

115. In an October 22, 2026 letter to her patients, Dr. Hamawi wrote:

> For 2 1/2 years, I was quietly having success with ivermectin and hydroxychloroquine, and none of my patients died. In fact, all recovered from COVID within 24-48 hours, even during the terrible Delta wave when more people were dying in the US than anywhere else.
>
> The propaganda machine clouded many of my fellow doctors' thinking. In late 2023, one of them reported me to the Medical Board (BORIM). I'll never know his reasons for sure, but I have an idea. Since then, I have been trying to defend my viewpoint to no avail. Their ears are closed. They have their own mission and, this summer, threatened my license to practice.
>
> Getting in trouble for doing the right thing, I know I am in a bad relationship that I haven't been able to fix from within. The conditions under which I would have to practice would not allow me to be honest with you. This is a position I cannot tolerate, as it would require me to violate my Hippocratic Oath. As a result, I have filed a suit against the Massachusetts Board of Registration in Medicine and will retire from medical practice on May 1, 2027.
>
> . . .
>
> Under these circumstances, I cannot sell my practice. You will all need to find a new primary care provider (PCP). These days, finding a new PCP in Massachusetts can take a long time, so I encourage you to start looking as soon as possible.

116. After retiring from private practice, Dr. Hamawi wishes to retain her medical license so that she could continue providing her objective professional viewpoints in clinical settings and as part of expert testimony, including her viewpoints concerning available

treatments for COVID-19—and to prescribe such treatments if doing so is safe, potentially effective, and is not otherwise forbidden by federal or state law.

**COUNT I**
**(Viewpoint Discrimination under the First and Fourteenth Amendments in Violation of 42 U.S.C. § 1983)**

117. Dr. Hamawi realleges and incorporates by reference paragraphs 1 through 117.

118. BORIM is a state actor.

119. The First Amendment is applicable to BORIM through the Due Process Clause of the Fourteenth Amendment.

120. Neither the federal nor the Massachusetts government has promulgated any specific statutory or regulatory prohibitions on off-label prescribing or use of either ivermectin or hydroxychloroquine for genuine medical purposes like the treatment or prevention of COVID-19.

121. BORIM targeted Dr. Hamawi for investigation based on a non-patient complaint that Dr. Hamawi had recommended and prescribed ivermectin and hydroxychloroquine to her patient off-label for treating or preventing COVID-19.

122. BORIM's investigation caused Dr. Hamawi to suffer an actual and ongoing injury to her First Amendment rights by deterring Dr. Hamawi from providing to her patients her objective professional viewpoint concerning the off-label use of ivermectin and/or hydroxychloroquine for the treatment or prevention of COVID-19, due to fear of further disciplinary consequences.

123. Dr. Hamawi faces an imminent future injury to her First Amendment rights because BORIM's investigation comes with the credible threat from BORIM's Complaint Committee that BORIM imminently will proceed with disciplinary proceedings against

Dr. Hamawi based on the information provided by Dr. Hamawi to her patients concerning the off-label use of ivermectin and hydroxychloroquine for the treatment or prevention of COVID-19. The investigation further comes with the credible threat from BORIM's complaint counsel that a possible outcome of the disciplinary proceedings is medical license suspension.

124. After retiring, Dr. Hamawi intends to continue using her medical license to provide her objective professional viewpoints in clinical settings and as part of expert testimony, including her viewpoints concerning the off-label use of ivermectin and/or hydroxychloroquine for the treatment or prevention of COVID-19.

125. Enjoining BORIM members, in their official capacities, from investigating, prosecuting, accusing, or sanctioning Dr. Hamawi based on the viewpoint of any information, recommendations, or advice Dr. Hamawi gave or intends to give to patients concerning off-label use of ivermectin and/or hydroxychloroquine to treat or prevent COVID-19 will redress both the current and future injuries caused by such enforcement to Dr. Hamawi's First Amendment right, including by allowing her to keep her medical license after retirement.

126. The current and future injuries to Dr. Hamawi's First Amendment right to truthfully and honestly counsel her patients to the best of her objective professional judgment give rise to a sufficiently concrete interest in adjudicating her patients' mirror-image rights to receive a minority "second opinion" from Dr. Hamawi about what she considers the optimal course of action for the patient based on her objective professional judgment, without any withheld information, including information about the benefits, risks, and costs of appropriate alternatives to treatments favored by majority medical opinion.

127. The close nature of the doctor-patient relationship assures Dr. Hamawi's effective representation of the patients' First Amendment rights to receive minority medical opinion from Dr. Hamawi, including information about appropriate alternatives to treatments favored by majority medical opinion.

128. A patient's assertion of her own rights in the instant matter may be obstructed by medical privacy and mootness issues.

129. Therefore, Dr. Hamawi also has *jus tertii* standing in this matter on behalf of her patients.

130. No patients were harmed by or made complaints to BORIM against Dr. Hamawi due to using ivermectin and/or hydroxychloroquine to treat or prevent COVID-19 according to Dr. Hamawi's recommendation.

131. Zero (0) deaths and only two (2) unrelated hospitalizations among the 165 patients who used ivermectin and/or hydroxychloroquine to treat or prevent COVID-19 based on Dr. Hamawi's recommendation and prescription is an objectively good treatment record in light of the disease's overall pandemic mortality rate of 1.1% in the United States,[2] and especially given Dr. Hamawi's patients' comorbidities.

132. BORIM did not investigate Dr. Hamawi's use of ivermectin to treat scabies, even though ivermectin is not approved by the FDA for this purpose.[3]

133. BORIM did not investigate, discipline, or threaten to discipline BORIM member Sandeep Jubbal for his use of mAb treatments to treat COVID-19 in line with the majority medical opinion in Massachusetts.

---

[2] *See, e.g.*, Coronavirus Resource Center, *Mortality Analyses*, Johns Hopkins University of Medicine (Mar. 10, 2023), https://coronavirus.jhu.edu/data/mortality.

[3] BORIM also did not investigate Dr. Hamawi's use of hydroxychloroquine to treat or prevent COVID-19, so its threatened enforcement appears to be focused only on Dr. Hamawi's viewpoint concerning the safety and potential effectiveness of ivermectin to treat or prevent COVID-19.

134. On information and belief, BORIM did not discipline any other physicians for providing COVID-19 treatments favored by the majority medical opinion in Massachusetts.

135. According to its final decision and order in Dr. Diggs's matter, BORIM considers the use of ivermectin for treating COVID-19 to constitute "treatment falling below the accepted standard of care."

136. BORIM's investigation and discipline of Dr. Diggs for using ivermectin to treat COVID-19 pursuant to BORIM's generic standard-of-care powers, as well as BORIM's claim that Dr. Diggs disseminated misinformation by communicating the minority medical viewpoint that ivermectin is safe and potentially effective for the treatment and prevention of COVID-19, further show that BORIM disfavors this minority viewpoint.

137. Because BORIM disciplined or threatened to discipline Dr. Hamawi specifically for stating a minority medical viewpoint to patients concerning COVID-19 treatments, it did so based directly on the viewpoint of Dr. Hamawi's speech, and not for reasons unrelated to content or viewpoint.

138. After *Chiles v. Salazar*, 607 U.S. 627 (2026), because the only reason for Dr. Hamawi's investigation and threatened future discipline is BORIM's disfavor of her minority viewpoint concerning COVID-19 treatments, BORIM may no longer ground its investigation and threatened future discipline of Dr. Hamawi under its generic standard-of-care powers, like it did with Dr. Diggs.

139. BORIM may not transform prevailing opinion into enforced conformity, even for purposes of maintaining a particular standard of care. The Massachusetts standard of care may not be used to curtail Dr. Hamawi's First Amendment right to free speech as part of

the physician-patient relationship, and her patients' rights to a second opinion, solely due to the minority status of that opinion.

140. Therefore, the BORIM Defendants, sued as its individual members in their official capacity, are engaging in ongoing and future threatened deprivations of Dr. Hamawi's First and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983, causing her injury.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff, Dr. Tatiana Hamawi, M.D., requests that this Court:

a) Declare that Defendant BORIM members, in their official capacities, have violated Dr. Hamawi's rights under the First and Fourteenth Amendment by discriminating in its physician licensing and discipline decisions concerning Dr. Hamawi based on Dr. Hamawi's minority medical viewpoint concerning the safety and efficacy of ivermectin and/or hydroxychloroquine to treat or prevent COVID-19.

b) enter judgment in Dr. Hamawi's favor and against the individual Defendant BORIM members in their official capacities pursuant to 42 U.S.C. § 1983;

c) enjoin the individual Defendant BORIM members' and their officers, agents, employees, and all persons in active concert or participation with them, in their official capacities, from investigating, prosecuting, accusing, or sanctioning Dr. Hamawi under BORIM Dkt. No. 23-570—or based on the viewpoint of any information, recommendations, or advice Dr. Hamawi gave or intends to give to patients concerning ivermectin and/or hydroxychloroquine to treat or prevent COVID-19;

d) award Dr. Hamawi reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

e) grant any other relief that the Court deems proper.

Respectfully submitted,
Plaintiff, Tatiana Hamawi,
By her attorney,

Ilya I. Feoktistov, Esq.
B.B.O. No. 704458
LAW OFFICE OF ILYA FEOKTISTOV
60 Burnham Drive
Falmouth, MA 02540
(617) 462-7938
if@ilyafeoktistov.com

DATED: November 4, 2026.

**VERIFICATION OF FIRST AMENDED COMPLAINT**

I, Tatiana Hamawi, am the Plaintiff. I have read the foregoing First Amended Complaint and know its contents.

The factual statements contained in the First Amended Complaint are true and correct to the best of my knowledge, information, and reasonable belief. I make this verification for the purpose of filing the First Amended Complaint in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on Nov 04, 2026, at Westborough, Massachusetts.
*(town)*

Tatiana Hamawi (Nov 4, 2026 22:50:16 EST)

Tatiana Hamawi

**CERTIFICATE OF SERVICE**

I certify that on November 4, 2026, I served the foregoing Verified First Amended Complaint on Massachusetts Assistant Attorney General Frances Cohen, Esq., counsel for defendant Massachusetts Board of Registration in Medicine, by email at frances.cohen@mass.gov.

Ilya Feoktistov